UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YUSUPHA TOURAY,

    Plaintiff,

    v.

GLACIER FISH COMPANY, LTD., *et al.*

    Defendants.

Case No. C05-1388RSL

MEMORANDUM OF DECISION

    This matter was heard by the Court in a bench trial commencing on January 8, 2007, and concluding on January 10, 2007. Plaintiff Yusupha Touray, a seaman, seeks damages for bi-lateral knee injuries he claims were caused by lifting and carrying heavy boxes of frozen fish while working in the freezer hold in the service of the Pacific Glacier. Plaintiff argues that defendant's[1] failure to train, failure to provide adequate staff and equipment, and requiring him to lift and carry excessive weight was negligent, giving rise to liability under the Jones Act, 46 U.S.C. § 688. Plaintiff also alleges that defendant is absolutely liable for injuries caused by an unseaworthy condition on board the vessel. Plaintiff seeks past and future expenses related to cure and lost income. This Court has admiralty jurisdiction over this matter under general maritime law and the Jones Act, 46 U.S.C. § 688, *et seq*.

---

[1] Plaintiff did not pursue claims against the other defendant, the vessel, so "defendant" in this order refers to plaintiff's former employer, Glacier Fish Company.

MEMORANDUM OF DECISION - 1

## I. FACTUAL BACKGROUND

Plaintiff worked in the "freezer hold" of the Pacific Glacier. Other workers unloaded boxes of frozen fish from plate freezers, then sent the boxes via conveyors to the freezer hold below the deck. Plaintiff removed the boxes from the conveyor and either dropped them or stacked them. The boxes of block product weighed approximately 50 pounds, and the boxes of surimi weighed about 45 pounds. Plaintiff worked a 16-hour shift, which included three half-hour lunch breaks. On a good day, the vessel processes approximately 110 tons of fish.

Plaintiff alleges that on June 14, 2003, his knees became very painful. The first mate, who also worked as the ship's medic, gave plaintiff ibuprofen for the pain, and plaintiff returned to work. After plaintiff complained again of pain, he was assigned to a different job that did not involve heavy lifting but required him to stand for most of the day. After the trip ended, plaintiff received medical care at a clinic in Alaska. Plaintiff returned home to Florida and sought advice from an orthopedic surgeon, Dr. Hogan Yi. Plaintiff returned to work on the Pacific Glacier in February 2004. Although he was assigned to a different job, he experienced pain and was medically discharged. Plaintiff underwent physical therapy and surgery on his knees. He now works as a taxicab driver in Florida.

## II. SETTLEMENT

Defendant alleges that plaintiff agreed to settle his claims. In support of that allegation, defendant notes that plaintiff accepted defendant's advance of $2,500. The statement that accompanied the payment explicitly referred to it as an "advance against settlement." Ex. 513. Plaintiff signed the statement, cashed the check, and contacted defendant on several occasions seeking a settlement offer, all of which is persuasive evidence that plaintiff intended to settle his claim.

However, at the time plaintiff allegedly agreed to settle his case, two material terms had not been finalized. First, plaintiff testified that he never agreed to settle his claims for the amount offered. Second, plaintiff had not seen the two documents Glacier sent to him – the "rights of seamen" and the "receipt and release" – when the parties allegedly reached their oral

MEMORANDUM OF DECISION - 2

agreement. Once he read the documents, he refused to sign them. Both the amount of consideration and the signed release were material terms of the agreement for both parties. Based on plaintiff's testimony, which the Court found credible in this area, there was no meeting of the minds as to either term. Also, Pacific Glacier's claims adjuster Mike Luenella testified that he did not receive the signed release, and would not have paid plaintiff without receiving it. Therefore, the Court finds that the parties did not form an agreement to settle.

### III.  JONES ACT NEGLIGENCE

Under the Jones Act, the basis for a ship owner's liability is grounded in negligence; the mere fact of injury will not suffice. The quantum of evidence necessary to support a finding of Jones Act negligence is less than that required for common law negligence: "a seaman must demonstrate only that his employer's negligence played any part, even the slightest, in producing his injury" to sustain a finding of liability. Ribitzki v. Canmar Reading & Bates, Ltd. P'ship, 111 F.3d 658, 662 n.3 (9th Cir. 1997). Nevertheless, plaintiff has the burden of establishing all four elements of a Jones Act claim, namely duty, breach, notice, and causation. Havens v. F/T POLAR MIST, 996 F.2d 215, 218 (9th Cir. 1993).

A ship owner or employer owes seamen a duty under the Jones Act to provide a safe place to work. Glynn v. Roy Al Boat Mgmt. Corp., 57 F.3d 1495, 1498 (9th Cir. 1995). Whether defendant breached that duty and whether such a breach caused plaintiff's damages were hotly contested at trial. The Court has considered the evidence presented at trial, the exhibits admitted into evidence, the arguments of counsel and, being fully advised, finds that plaintiff has not met his burden of showing that the Pacific Glacier was an unsafe place to work.

Plaintiff alleges that five factors caused an unsafe work environment. First, plaintiff alleges that at times he was unable to keep up with the pace of boxes coming down the conveyor, and the only equipment defendant provided to slow the pace, the "loud-hailer" intercom, was ineffective. As an initial matter, plaintiff did not show that the pace of boxes coming down the conveyor was unreasonable or unsafe. The Court watched a video of the process. According to the video and the witnesses' testimony, a box would come down the

MEMORANDUM OF DECISION - 3

conveyor every 6-7[2] seconds. The freezer worker would then pick up the box, carry it no more than 17 feet, and either drop it to the floor or stack it. It takes a freezer worker approximately 11 minutes to stack the contents of a plate freezer, and they stack the contents of no more than two plate freezers per hour. The worker might then spend approximately twenty minutes cleaning up, and have twenty minutes per hour to rest.[3] None of the workers testified that the pace of the work was too fast or that they ever observed Mr. Touray struggling to keep up with the pace. In short, there was no evidence that the pace of the work was unreasonable.

Furthermore, although plaintiff claimed that he was unable to control the pace of the boxes, the evidence showed that the pace was rarely a problem. The speed at which the boxes came down the conveyor was constant, and there was no way for other workers to speed up the flow of boxes. Although boxes occasionally came down two at a time, that condition was rare. Moreover, freezer workers could allow the boxes to rest on the rollers, or they could stack them in an easily accessible area until they had more time. Because there were other ways to control the pace safely, the occasional failure of the loud-hailer did not create an unsafe working condition.

Second, plaintiff alleges that he was never trained on how to carry the boxes or instructed not to carry them two at a time. He contends that to keep up with the pace, he sometimes had to carry two boxes at a time, resulting in a total weight of approximately 100 pounds. The evidence at trial, however, showed that defendant provided on the job training, and the crew

---

[2] At times, the boxes may have come down the conveyor even more slowly. Freezer foreman Wes Tabaka stated during his deposition that the boxes came at a rate of one every 10 seconds, which was what the Court observed on the videotape played during trial. By all accounts, the videotape showed a pace of work and conditions in the freezer hold which were substantially the same as those experienced by Mr. Touray.

[3] Plaintiff testified that he spent approximately 11 of his 14 ½ hour shift stacking boxes in the freezer hold. If plaintiff had really stacked boxes for 11 hours per day at a rate of one box every 6-7 seconds, he would have stacked approximately three times the numbers of boxes actually loaded in an average day.

MEMORANDUM OF DECISION - 4

held safety meetings before the start of each trip. Defendant's expert Amy Duz testified that on the job training was typical in the industry. In fact, plaintiff's expert, vocational expert John Berg, testified that plaintiff "has a high aptitude for learning by doing." Furthermore, other employees testified that the job was straightforward.

Plaintiff testified that when he carried two boxes at a time, he did so by grabbing them by the straps. Although plaintiff might have occasionally picked up boxes by the straps, his testimony that he did so with any frequency was not credible based on the factors identified in 9th Circuit Civil Jury Instruction 3.6. None of the other witnesses carried boxes two at a time or observed plaintiff doing so. Tabaka Dep. at pp. 26-27 (explaining, "No one carries two boxes" at once because it would take longer to do so). Plaintiff never observed other workers carrying the boxes two at a time. Other workers credibly testified that the straps were applied tightly by a machine to keep the boxes closed, which would not allow them to be loose enough to be carried by an employee wearing gloves except on rare occasions. Finally, although plaintiff described how he became injured to several different people, he never told anyone that he carried two boxes at a time. Accordingly, plaintiff did not show that the training he received was inadequate or that it caused his injury.

Third, plaintiff alleges that he had no one to assist him while the other freezer worker was taking lunch breaks. However, when the other worker was taking a break, his conveyor was shut down. Therefore, during that time, plaintiff was performing the same job at the same pace as when that worker was not on a break. Although plaintiff alleges that the workers could help each other if one line was slow, he did not show that the staffing levels or the pace of the work created an unsafe working environment.

Fourth, plaintiff alleges that he was sent back to work in the freezer hold after he informed the first mate that the pain in his knees was unbearable. Instead, he contends, defendant should have reassigned him or taken him off duty. However, when plaintiff first raised the issue of his knees, he stated that his knees were stiff in the morning from climbing the ladder in the freezer hold and requested a heating pad, which defendant provided. Ex. 21. The

MEMORANDUM OF DECISION - 5

next day, plaintiff complained again of pain in his knees and asked to be reassigned. The first mate reassigned him to the factory deck. Ex. 22. In February 2004, plaintiff was assigned to work at the roe table and not in the freezer hold. When he complained that standing was hurting his knees, he was allowed to take the rest of the shift off. After he stated that his knees continued to hurt, he was permitted to take the rest of the trip off. Exs. 23-26. The evidence, therefore, does not support plaintiff's contention that he was forced to continue working despite his pain.

Fifth, plaintiff alleges that the amount of weight he was required to lift and carry was excessive. This issue was hotly contested during trial. It has broader implications for the industry because the amount of weight in the boxes is fairly standard across the industry. Captain Kirk Greiner (ret.)[4] testified that the Court should apply a guideline from the National Institute for Occupational Safety and Health ("NIOSH"). The NIOSH guideline is intended to determine a safe lifting task to prevent back injuries and potentially reduce other musculoskeletal injuries. Captain Greiner opined that based on the guideline, the maximum weight a worker should safely lift under the circumstances was approximately 25 pounds. When he included the extreme temperature, the carrying distance, and other factors, he opined that the maximum weight should be even lower. Plaintiff has not shown, however, that the guideline has ever been adopted or applied in these circumstances. The guideline is not part of the regulations of the Occupational Safety and Health Administration ("OSHA"). There was no evidence that OSHA has used the guideline to issue citations to commercial fishing vessels. Plaintiff did not cite any cases, and Captain Greiner was not aware of any, which used the NIOSH guideline to determine negligence or unseaworthiness.

---

[4] Captain Greiner also testified that defendant's staffing levels, lack of training, and failure of the loud-hailer all created an unsafe work environment. No other witness expressed those opinions. The Court gave no weight to Captain Greiner's testimony in these areas because it was conclusory and unsupported and because the opinions were not included in his expert report or disclosed during his deposition.

MEMORANDUM OF DECISION - 6

Furthermore, the guideline has little applicability in the real world or to plaintiff's circumstance. According to the Captain Greiner, the purpose of the guideline is to prevent all lifting injuries "by setting a safe weight limit so as to protect almost the entire working population." Ex. 64 at p. 2. Captain Greiner acknowledged during trial that a "large number" of workers can lift more than the NIOSH guideline suggests. However, the guideline is intended to protect the "weak guy" to prevent 99% of injuries. However, Mr. Touray is a large man who, according to his expert Dr. Theodore Becker, had well above average strength. Also, Ms. Duz opined that the NIOSH guideline is inapplicable to this circumstance. Based on the evidence and testimony, the Court finds that plaintiff did not present any persuasive evidence that the weight of the boxes was excessive under the circumstances. In contrast, the industry has used boxes of 45-50 pounds and has done so for approximately 20 years. Defendant did not receive any complaints about the pace of the work or the weight of the boxes. There was no evidence that any other workers complained of or experienced knee or other musculoskeletal problems due to working in the freezer hold. Defendant had not received any citations or warnings from OSHA about its lifting practices or the weight of the boxes. Plaintiff failed to show that the weight he was required to lift and carry was excessive or unsafe under the circumstances.

In sum, defendant did not breach its duty to provide a safe work place.

## IV.  UNSEAWORTHINESS DOCTRINE

Plaintiff asserts that the same factors that demonstrate defendant's negligence also made the vessel unseaworthy. A vessel is unseaworthy if the ship, its appurtenances and equipment, or its crew is not reasonably fit for its intended use. See, e.g., Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 499 (1971). Although the shipowner's duty to provide a seaworthy vessel is absolute (*i.e.*, actual knowledge, constructive knowledge, or negligence need not be proven), the duty does not require that the shipowner provide an accident-free ship, just one that is reasonably fit for its intended service. See, e.g., Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960).

As discussed above and for all the same reasons, the Court finds that plaintiff has not met

MEMORANDUM OF DECISION - 7

his burden of showing that the Pacific Glacier was unseaworthy.

## V. MAINTENANCE AND CURE

Maritime law places on the shipowner the burden of paying maintenance (cost of room and board that would have been provided had the seaman remained on the ship) and cure (medical costs) if a seaman is injured or becomes ill while in the ship's service. In order to promote broad coverage and to avoid uncertainties regarding the right to maintenance and cure, the Supreme Court has determined that if there are any ambiguities or doubts regarding a shipowner's liability, they must be resolved in favor of the seaman. Vaughan v. N.J. Atkinson, 369 U.S. 527, 532 (1962); Farrell v. United States, 336 U.S. 511, 516 (1949). Unlike the Jones Act and the unseaworthiness doctrine, maintenance and cure is owed without regard to the employer's fault or negligence. Farrell, 336 U.S. at 515-16.

Plaintiff does not seek additional maintenance payments. He argues that defendant is responsible for paying a $350.00 bill from his treating physician, Dr. Yi, from a visit on or around October 12, 2006. Ex. 5. Defendant refused to pay the bill because Dr. Yi opined that plaintiff reached maximum medical improvement as of August 16, 2004. It appears from Dr. Yi's note that plaintiff's October 12, 2006 visit to him was curative. Therefore, defendant is required to pay that bill.

Plaintiff also alleges that defendant should be required to pay his future medical expenses, in the amount of his previous knee surgery, in case he has another knee surgery in the future. In October 2006, Dr. Yi opined that plaintiff did not need an additional surgery at that time, but he "may need it in the future." Dr. Yi Dep. at p. 84. Whether plaintiff will need and obtain the surgery, the nature of the surgery, and how much it will cost are all unclear at this time, and therefore the Court will not address this issue in a hypothetical situation.

Plaintiff also alleges that he is entitled to recover his attorney's fees because defendant willfully refused to pay for the October 2006 visit. The Court finds that the refusal to pay was not willful. Rather, defendant had a reasonable basis for concluding, based on Dr. Yi's previous opinions, that plaintiff reached maximum cure long before October 2006 and that the subsequent

MEMORANDUM OF DECISION - 8

visit was for trial purposes.  Furthermore, plaintiff clearly did not pursue this case to obtain reimbursement for the October 2006 visit, and he concedes that he was paid all other maintenance and cure owed.  Accordingly, plaintiff is not entitled to recover his attorney's fees.

### VI.  CONCLUSION

This was not an easy case for the Court to decide.  Mr. Touray is a likeable, hard-working man who was a valued employee of Glacier Fish Company.  He no doubt began experiencing serious problems with his knees while in service to the vessel.  Plaintiff, however, did not meet his burden of showing any negligence by the defendant or an unseaworthy condition aboard the vessel.  The issue is not whether Mr. Touray's performance of his job was a contributing factor or even the main cause of his devastating knee injuries.  The plaintiff has been unable to prove that there was anything the defendant did or did not do or anything about the vessel and its practices that was negligent or unseaworthy and thereby caused plaintiff's damages.  Accordingly, he is entitled to maintenance and cure only, and he has been paid all such amounts owed, except for the October 2006 bill from Dr. Yi.

For all of the foregoing reasons, the Court finds that plaintiff is only entitled to past medical expenses in the amount of $350.00.  The Clerk of the Court is directed to enter judgment accordingly, finding for defendant on plaintiff's claims of negligence and unseaworthiness.

DATED this 22nd day of January, 2007.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge